# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

### No. 201600282

_____

### UNITED STATES OF AMERICA
Appellee

v.

### JOSE M. MEDELLIN
Corporal (E-4), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major Michael D. Zimmerman, USMC.
For Appellant: Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Captain Sean M. Monks, USMC;
Lieutenant George R. Lewis, JAGC, USN.

_____

Decided 28 August 2018

_____

Before WOODARD, HUTCHISON, and TANG, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

HUTCHISON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant in absentia[1] and contrary to his pleas of one specification each of aggravated sexual contact with a child and indecent liberties with a child, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §

_____

[1] The appellant voluntarily absented himself after the close of the government's case, but before the announcement of findings. *See* Record at 934.

920 (2008),[2] and one specification each of sexual assault of a child and sexual abuse of a child, in violation of Article 120b, UCMJ, 10 U.S.C. § 920b (2012). The appellant was sentenced to 55 years' confinement, total forfeitures, reduction to pay grade E-1, and a dishonorable discharge. The convening authority approved the adjudged sentence and, except for the dishonorable discharge, ordered it executed.

The appellant raises four assignments of error (AOEs): (1) in light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), the military judge's admission of charged sexual misconduct pursuant to MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 414, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2014 ed.) and subsequent instructions violated the appellant's constitutional right to due process; (2) the military judge abused his discretion by admitting a victim's out-of-court statements; (3) the appellant's sentence to 55 years' confinement is inappropriately severe; and (4) the evidence is factually insufficient.

We find merit in the appellant's first AOE, conclude the error was not harmless beyond a reasonable doubt, and take corrective action in our decretal paragraph.[3]

## I. BACKGROUND

While home on leave in December 2011, the appellant and his large extended family celebrated the holidays at his Grandma Z's home in Milwaukee, Wisconsin. One evening, after attending a professional basketball game with his family, the appellant returned to Grandma Z's house and went upstairs into a bedroom with his seven-year-old brother and his two five-year-old cousins, SF and NP. Both SF and NP alleged that the appellant touched them inappropriately while in the bedroom. Specifically, SF testified that the appellant "touched [her] with his hands and touched [her] butt" when she was at Grandma Z's house in the bedroom with NP and the appellant's brother.[4] She denied seeing the appellant touch NP.[5] NP testified that the appellant touched "his front part" to her "front part."[6] On cross-examination, NP elaborated that Grandma Z came upstairs and started yelling at the appellant,

---

[2] The members acquitted the appellant of one specification each of aggravated sexual assault of a child and abusive sexual contact with a child, alleged in violation of Article 120, UCMJ.

[3] We do not reach the remaining AOEs.

[4] Record at 465.

[5] *Id.* at 474. ("Q. [Y]ou didn't see anything happen to N.P. though? She just told you? A. No. I didn't see anything happen to her, she just told me.").

[6] *Id.* at 523.

"cussing him," and kicked him out of the house.[7] NP also testified that the appellant punched and kicked both her and the appellant's brother. Grandma Z testified that she never saw anything out of the ordinary and that SF and NP were asleep when she saw them. Likewise, the appellant's brother testified that he was playing video games in the room with SF and NP and was not aware of anything sexual going on between SF, NP, and the appellant. He also testified that the appellant did not punch or kick him, and that he did not see the appellant punch or kick SF or NP.

In the following two years, the appellant met and married his wife and became stepfather to his wife's daughter, RL. By April 2014, the appellant, his wife, and RL had moved to Marine Corps Base Camp Pendleton, California. On 16 April 2014, the appellant's wife took her best friend, SR, who was visiting from Maryland, out for the day while the appellant remained home with RL. When the appellant's wife and SR returned, RL reminded the appellant, "[d]on't forget you have something to tell mommy."[8] Shortly thereafter, the appellant and his wife stepped outside to talk in private. The appellant's wife asked the appellant what RL meant. The appellant became visibly upset and said that he had accidently touched RL's vagina while he was tickling her. Although she was aware of the previous allegations made against the appellant by SF and NP, the appellant's wife believed the appellant's explanation. While the appellant and his wife were talking privately, SR asked RL what the appellant had to tell his wife, and RL responded that she and the appellant "had played doctor."[9]

The next day, while SR and RL were getting ready for the day, SR followed up on their brief conversation and asked RL what it meant to play doctor. After some hesitation, RL told SR that the appellant had lifted up her dress, put his hand in her underwear, and touched her vagina. SR relayed that information to the appellant's wife and they further questioned RL. RL revealed that the appellant "lifted up her skirt and put his finger in her hole[.]"[10] RL also explained that the appellant rolled her over, placed a blanket over her, and began making thrusting motions with his body pressed firmly against hers.

Following her conversation with RL, the appellant's wife contacted the appellant and told him he needed to come home. When the appellant arrived, she confronted him with what RL had said. The appellant said "he would never have done that, and that it didn't matter if [she] found out if it was true or not

---

[7] *Id.* at 530.

[8] *Id.* at 621.

[9] *Id.* at 781.

[10] *Id.* at 624.

because [their] relationship was over."[11] The appellant then packed a bag and left the home. He was apprehended later that day by base police.

At trial, the government presented the testimony of SF, NP, Grandma Z, the Milwaukee police officers who conducted the forensic interviews of SF and NP, and SF's and NP's mothers—the appellant's aunts. The government also introduced the recorded forensic interviews of SF and NP as prior consistent statements.[12] RL testified, but had no memory of the offenses. In fact, RL had almost no recollection of the appellant—her stepfather—at all, solely recalling one occasion when he gave her two stuffed animals. But the appellant's wife and SR testified about the statements RL made to them and, through a forensic interviewer, the government introduced a recorded forensic interview of RL.[13] In pre-trial motions, RL testified she did not recall giving this forensic interview. Finally a physician testified about the medical exam he performed on RL, in which he noted that the exam was normal and could neither "confirm nor refute abuse."[14]

The appellant's trial defense counsel presented the testimony of the appellant's brother—who had been present during the alleged abuse of SF and NP—and Grandma Z, as well as subsequent, recorded forensic interviews of SF and NP—conducted in 2015—as prior inconsistent statements.[15] The trial defense counsel also called an expert forensic psychologist to testify about suggestibility in child interviews and memory contamination.

Over defense opposition,[16] the military judge concluded that evidence of each charged specification was admissible, pursuant to MIL. R. EVID. 414, as propensity evidence for the other charged child molestation offenses.[17] Consequently, the military judge instructed the members that they could "consider the evidence of such other child molestation offense for its tendency, if any, to show the accused's propensity or predisposition to engage in child molestation offenses," and that such evidence could "be considered by [the

---

[11] *Id.* at 627.

[12] *See* Prosecution Exhibits (PE) 10 and 12, respectively.

[13] *See* PE 5. In addition, the forensic interviewer testified about the protocols she followed while conducting the interview.

[14] Record at 751.

[15] *See* Appellate Exhibits (AE) LXIV and LXV, respectively.

[16] *See* AE XXXVII.

[17] *See* Record at 976 ("I think there is enough reason to also allow them, if they so choose, to use the instruction under 414 properly and use that evidence if they find that it's apt for the purpose that 414 allows it. So I am going to give the 414 instruction with regard to the offenses.").

members] even if [they] are not convinced beyond a reasonable doubt that the accused [is] guilty of some of those offenses."[18]

The members convicted the appellant of digitally penetrating RL, rubbing his body against hers, touching SF's buttocks, and exposing his penis to NP. The members found the appellant not guilty of having sex with NP and of touching her breasts.

## II. DISCUSSION

### A. Law

In *Hills*, the Court of Appeals for the Armed Forces (CAAF) held that using evidence of charged sexual misconduct as propensity evidence relevant to other charged sexual misconduct is inconsistent with an accused's right to presumed innocence. 75 M.J. at 357. Where an instructional error rises to a constitutional dimension, as it does here, we review the error to determine if it was harmless beyond a reasonable doubt. *United States v. Kreutzer*, 61 M.J. 293, 298 (C.A.A.F. 2005). A constitutional error is harmless only when the government can "prove there was no reasonable possibility that the error contributed to [the] verdict." *United States v. Hukill*, 76 M.J. 219, 222 (C.A.A.F. 2017) (citations omitted). But, "[t]here are circumstances where the evidence is overwhelming, [and] we can rest assured that an erroneous propensity instruction did not contribute to the verdict by 'tipp[ing] the balance in the members' ultimate determination.'" *United States v. Guardado*, 77 M.J. 90, 94 (C.A.A.F. 2017) (quoting *Hills*, 75 M.J. at 358).

In *Guardado*, the CAAF concluded that the military judge's propensity instruction "seriously muddled" Master Sergeant Guardado's right to "a presumption of innocence and to be convicted only by proof beyond a reasonable doubt[.]" *Id.* at 94. The CAAF then reversed his sexual assault conviction because the court was "unable to conclude that the military judge's [MIL. R. EVID.] 413/414 instruction was harmless." *Id.* at 95. The CAAF held that while "[the victim's] testimony was credible, the lack of supporting evidence makes it difficult to be certain that [the appellant] was convicted . . . on the strength of the evidence alone." *Id.* at 94.

In *United States v. Williams,* 77 M.J. 459 (C.A.A.F. 2018), Sergeant Williams was charged with sexually assaulting both of his previous wives. As in *Guardado* and *Hills*, the military judge erroneously instructed the members, pursuant to MIL. R. EVID. 413, that evidence of sexual assault against one of the victims could be used as propensity evidence against the other, and vice versa. The CAAF again found that while the victims "provided credible testimony . . . , their accounts were largely uncorroborated by eyewitness

---

[18] *Id.* at 1032-33; AE LXXI at 6.

testimony or any conclusive documentary or physical evidence." *Id.* at 464. Consequently, the court set aside Williams's convictions because "[a]bsent any supporting evidence, [they] simply [could not] be certain that the erroneous propensity instruction did not taint the proceedings or otherwise 'contribute to the defendant's conviction or sentence.'" *Id.* (quoting *Hills,* 75 M.J. at 357).

Military appellate courts have on occasion found a military judge's erroneous propensity instruction harmless. In *United States v. Luna*, No. 201500423, 2017 CCA LEXIS 314 (N-M. Ct. Crim. App. 9 May 2017) (unpub. op.), we held that the military judge's erroneous propensity instruction was harmless beyond a reasonable doubt because: (1) the victim's testimony was compelling; (2) the victim's testimony was corroborated by incriminating text messages and eyewitness testimony; and (3) the trial counsel did not reference the propensity instruction in either his closing argument or rebuttal, but rather reiterated the government's burden of proving each element beyond a reasonable doubt. 2017 CCA LEXIS 314, at *17-18. The CAAF affirmed, concluding that "in light of . . . overwhelming evidence", Luna's conviction could stand "on the strength of the evidence alone." *United States v. Luna*, 77 M.J. 198, 198 (C.A.A.F. 2018) (mem.).

Similarly, in *United States v. Harrison*, No. ACM 38745, 2016 CCA LEXIS 431 (A.F. Ct. Crim. App. 20 Jul 2016) (unpub. op.), *aff'd*, 76 M.J. 127 (C.A.A.F. 2017) (mem.), the CAAF affirmed the Air Force Court of Criminal Appeals' (AFCCA) holding that, despite the military judge having erroneously instructed the panel on propensity, the error was harmless beyond a reasonable doubt. In support of its holding, the AFCCA noted that: (1) the government specifically distanced itself from any argument the appellant had a predisposition to commit sexual misconduct; (2) the appellant was only convicted of sexual misconduct where the victim's testimony was corroborated by either witness testimony or the appellant's admissions; and (3) if the members had misinterpreted the propensity instruction then the appellant would have likely not been acquitted of two sexual assault offenses. 2016 CCA LEXIS 431, at *35-36.

## B. Analysis

The government concedes the military judge's instruction was erroneous but, citing *Luna* and *Harrison*, argues the error was harmless.[19] We disagree.

---

[19] The government also cites *United States v. Moynihan*, 2017 CCA LEXIS 743, A. Ct. Crim. App. 30 Nov 2017) (unpub. op.). However, subsequent to the government's brief, the CAAF set aside our sister court's opinion in light of *Guardado. See United States v. Moynihan*, 77 M.J. 313 (C.A.A.F. 2018).

First, the military judge provided a muddled instruction—akin to the instructions provided in *Hills, Guardado,* and *Williams*—inviting the members to apply an impermissibly low standard of proof:

> Evidence that the accused committed the child molestation offenses alleged in the specifications under Charge I and Charge II may be considered for its bearing on any matter to which it is relevant in relation to any other offense in Charge I or Charge II. You may also consider the evidence of such other child molestation offense for its tendency, if any, to show the accused's propensity or predisposition to engage in child molestation offenses. It may be considered by you *even if you are not convinced beyond a reasonable doubt* that the accused is guilty of some of those offenses.[20]

This instruction allowed the members to reduce the government's burden of proof to seemingly any evidence at all. In short, the erroneous propensity instruction invited the members to "bootstrap their ultimate determination of the [appellant's] guilt" using an impermissibly low standard of proof with respect to the other charged offenses. *Hills*, 75 M.J. at 357.

Second, evidence against the appellant was not overwhelming and suffered from many of the same weaknesses that concerned the CAAF in *Hills, Guardado,* and *Williams*. The accounts of SF, NP, and RL—whether adduced through in-court testimony, recorded forensic interviews, or the testimony of others—were not corroborated by eyewitnesses or physical or documentary evidence. In fact, both SF and the appellant's brother testified that despite being in the same bedroom as NP, they never saw the appellant do anything to NP. Conversely, NP's account of the evening included elaborate details that were unsupported and, at times, contradicted SF's account of the evening. In addition, Grandma Z's testimony contradicted NP's version of events. Indeed, the members acquitted the appellant of two specifications involving NP. As for the 2014 allegations, RL's accounts and description of the appellant's actions—both in her statements to the appellant's wife and SR, and in her forensic interview—were credible, especially given her young age. Nonetheless, we find they were uncorroborated. Unlike *Luna* and *Harrison,* the appellant made no confessions, sent no incriminating text messages, and there were no corroborating witnesses. Here, the appellant admitted only that he accidentally touched RL's vagina while tickling her, but adamantly denied any sexual intent.

Finally, during his closing argument, unlike the prosecutors in *Luna* and *Harrison*, the trial counsel explained the propensity instruction, pointed out

---

[20] Record at 1032-33; AE LXXI at 6 (emphasis added).

that it was a "powerful instruction" and included it in a demonstrative presentation.[21] The trial counsel emphasized that evidence of the other charged acts could be used to demonstrate the appellant's "propensity or predisposition to engage" in acts of child molestation "even if [the members were] not convinced beyond a reasonable doubt that the [appellant was] guilty of some of those offenses[.]"[22] The trial counsel reiterated this point in rebuttal.[23]

Consequently, based on the facts of this case, we cannot be convinced that the erroneous propensity instruction played no role in the appellant's convictions or that he was convicted based on the strength of the admissible evidence alone. Accordingly, we find the error was not harmless beyond a reasonable doubt.

### III. CONCLUSION

The findings and the sentence are set aside. The record is returned to the Judge Advocate General for remand to an appropriate convening authority with a rehearing authorized.

Chief Judge WOODARD and Judge TANG concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court

---

[21] Record at 1003.

[22] *Id.*

[23] *Id.* at 1018-19 ("Once again, consider the instruction that I highlighted to towards the end of my initial argument, in that you can consider the various offenses for propensity purposes.").